## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JACQAUS L. MARTIN, | ) | 4:05CV3049 |
| | ) | |
| Plaintiff-Petitioner, | ) | |
| | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| ROBERT HOUSTON, | ) | |
| | ) | |
| Defendant-Respondent. | ) | |

JacQaus L. Martin has filed a habeas corpus petition pursuant to 28 U.S.C. § 2254, seeking relief from his state court conviction of third degree assault of an officer. That conviction stemmed from an incident which occurred while Martin was incarcerated at the Nebraska State Penitentiary in Lincoln, Nebraska.

Although I detail the relevant facts with citations to the record later in this opinion, I summarize key facts here to provide a context for explaining Martin's habeas claims. While Martin was incarcerated at the Nebraska State Penitentiary, an institution operated by the Nebraska Department of Correctional Services ("DCS"), he required hospitalization. Correctional officers Kevin Strasburg, Mark Rumery, and John LeDuc entered Martin's prison hospital room to feed him. Officer Strasburg testified that Martin struck him on the left cheek with his closed hand. Officer Rumery testified that he saw Martin strike Strasburg. Officer LeDuc testified that although he did not see Martin strike Strasburg, it was possible that Martin did strike Strasburg and LeDuc did not see it. Strasburg reported the incident but did not seek medical treatment for injuries. Martin was charged and convicted of third degree assault of an officer. Evidence submitted in this habeas proceeding indicates that there were no video tapes of the incident. The DCS protocol applicable to the use of force has been filed under seal with this court.

Martin claims that he suffered deprivations of due process, equal protection, and a fair trial in the course of his criminal prosecution for these reasons: (1) he was denied his right to a speedy trial; (2) a long list of actions by the trial judge curtailed his efforts to present a defense; (3) the trial judge permitted Brady[1] violations by refusing to require or allow disclosure of video tapes of the incident and the DCS protocol applicable to assaults by inmates; (4) in light of LeDuc's testimony, there was insufficient evidence to support the verdict, and (5) the trial judge denied Martin a free transcript, hampering his appeal.  I reject all of these claims.  The claim regarding the trial transcript has been defaulted and the default cannot be excused. The other claims are without merit, whether considered under a deferential standard or on de novo review.

## I. BACKGROUND

In an order on initial review of the petition, I directed the State to answer or file a motion for summary judgment.  (Filing 6.)  In response, the State filed a motion for summary judgment on the ground that the petition was a mixed petition containing both exhausted and unexhausted claims.  (Filing 7.)  The motion was supported by a brief and copies of certain state court records.  (Filings 8-9.)  Martin submitted documents to the court which amounted to briefs asserting that his petition was not a mixed petition.  (Filings 10, 13, 14.)  Based on this record, I denied the motion for summary judgment.  I found that only one of the claims (the denial of a free transcript) was procedurally defaulted–because that claim was not raised in any manner on direct appeal.  I further held that if Martin wished to pursue the claim that he was denied a free transcript, he would have an opportunity to demonstrate cause and prejudice to excuse the procedural default.  (Filing 16 at 3-4.)

---

[1]Brady v. Maryland, 373 U.S. 83 (1963).

The order denying summary judgment appointed counsel to represent Martin in this habeas proceeding. (Filing 16 at 4-5.) Approximately two and a half months later, Martin filed a motion to remove his appointed counsel and proceed pro se. (Filing 25.) I granted that motion and entered an amended progression order requiring the State to file all state court records, relevant or not. (Filing 28.) Additional state court records were then filed (filings 37, 38), many of them duplicating earlier-filed records (filing 9.)

I granted the respondent's motion for a protective order (filing 49), and the DCS protocol has been filed under seal (filing 53).[2] The parties have briefed the merits of this case and it is ripe for decision.[3]

Martin was serving the sentence imposed for the conviction at issue in this petition at the time he filed his petition. (Filings 1, 52.) Submissions by Martin indicate that he completed serving his sentence before this decision was rendered. (Filings 54, 55.) If Martin has in fact been released, his release does not divest this court of jurisdiction over Martin's habeas petition, as he was incarcerated at the time the petition was filed. Carafas v. LaVallee, 391 U.S. 234, 238-40 (1968) ("in custody" requirement of habeas statute is satisfied as long as petitioner was in

---

[2]Martin has filed an "Objection to Memorandum and Order as Unconstitutional" (filing 51), which I construe as a motion to reconsider the order in filing 49 (which directed that the DCS protocol be filed under seal and not disclosed to Martin) and deny.

[3]Martin sought leave to file an "amended brief and reply brief" (filing 50-1), and submitted the proposed amended brief (filing 50-2). I hereby grant Martin's motion and have considered Martin's amended brief.

Martin has also filed a "Motion to Compel Answer" (filing 54), which seeks a ruling on his habeas petition. I hereby grant that motion to the extent that this order is a ruling on his habeas petition and otherwise deny it.

custody when habeas petition was filed, even if petitioner is released prior to completion of proceedings on the habeas application).

### *Relevant State Court Matters*

Martin filed pretrial motions requesting additional responses to discovery requests, and the trial judge held a hearing on these motions on August 13, 2002. (Filing 9-11 at CM/ECF 30.)  At that hearing, a copy of the documents provided to Martin in discovery was introduced into evidence as Exhibit 1.  (Filing 9-11 at CM/ECF page 30  (portion of hearing transcript showing Ex. 1 admitted) and Filing 9-12 at CM/ECF pages 66 - 85 (contents of Ex. 1).)  These materials included reports of the incident by the officers involved.  Martin asserted that the discovery materials were incomplete, as he *believed* there were video tapes of the incident in his hospital room, medical records indicating whether Officer Strasburg was injured, and photographs documenting Officer Strasburg's alleged injury.   (Filing 9-11 at CM/ECF pages 24-31.)  Counsel for the state represented to the trial court that he was aware of no such discovery material and that if photographs or video tapes were later discovered, he would provide them.  (Filing 9-11 at CM/ECF pages 27, 29-30.)

Martin filed a "Motion to Add Witnesses" three months prior to trial.  A hearing was held on this motion on February 13, 2003.  (Filing 9-11 at CM/ECF pages 61-63.)  When asked by the trial judge what witnesses he wanted to add, Martin did not respond to the question.  (Filing 9-11 at CM/ECF 62:11-18.)  Counsel for the state indicated he had no objection to Martin calling *any* witnesses, so long as they were relevant to the charge for which Martin was being tried.  (Filing 9-11 at CM/ECF pages 62-63.)  The hearing was concluded without a ruling on Martin's motion to add witnesses.

At a May 9, 2003 pretrial conference held on the record, the affidavit of Teresa Predmore, a deputy warden, was admitted into evidence for the purpose of deciding

-4-

unresolved pretrial motions. (Filing 9-12 at CM/ECF page 4 (portion of transcript showing Ex. 4 admitted) and Filing 9-12 at CM/ECF pages 93-94 (contents of Ex. 4).) Predmore's affidavit stated that she was a deputy warden of DCS on June 7, 2002, that "it has come to my attention than an alleged assault occurred in the Nebraska State Penitentiary Hospital area room #2 involving inmate Jacqaus [sic] Martin . . . and Corporal Strasburg," and that she is aware that Martin requested a video tape of the alleged assault but "there is no video tape of the incident that occurred on June 7, 2002," because there were no "video cameras, surveillance cameras or filming equipment" in Martin's hospital room at the time of the incident. (Filing 9-12 at CM/ECF pages 93-94.)[4] Upon Martin's continued insistence that the court order the prison to produce video tapes of the incident, the trial judge stated that the state had "made a showing by affidavit on the tapes [to the effect that no tapes existed]. If there is any evidence to the contrary, that's not been presented to me." (Filing 9-12 at CM/ECF 9:8-10.)

The trial judge also ordered that DCS file with the court, under seal, the DCS protocol regarding the use of force. The judge ruled that he would examine the DCS protocol and would take further action if he found it to be exculpatory. (Filing 9-12 at CM/ECF page 8.)

Trial began on the afternoon of May 14, 2003, and at the end of that day trial was continued until June 9, 2003 to permit the trial judge to review the DCS protocol. Relevant portions of the trial testimony are set forth later in this order.

---

[4]Predmore's affidavit refers to the incident occurring on June 7, _2002_, and whether there were video tapes in the room in which the alleged assault occurred on June 7, _2002_. The incident occurred on June 7, _2001_. After review of the entire affidavit and the transcript of the hearing at which it was admitted into evidence, it is clear that _2002_ is a typographical error and Predmore meant to refer to June 7, _2001_.

During the state court proceedings, Martin at various times appeared pro se, pro se with standby counsel, and with appointed counsel. Martin was found competent to stand trial and to waive counsel after an evaluation and competency hearing on the trial court's own motion. (Filing 9-11 at CM/ECF 65:1-71:25; 73:10-75:7; Ex. 3 to competency hearing (opinion letter from psychiatrist, found in filing 9-12 at CM/ECF pages 87-90).) Martin waived the right to a jury and the right to counsel. (Filing 9-11 at CM/ECF page 91:14-92:19; 103.) Martin was pro se with standby counsel at times key to this habeas proceeding: the February, 2003 hearing on a motion to add witnesses (filing 9-11 at CM/ECF page 60); the trial judge's motion for competency review (id. at 91), and at trial (filing 9-12 at CM/ECF page 15).

At the close of trial, Martin argued a motion to dismiss because of an alleged violation of Nebraska's speedy trial statute, Neb. Rev. Stat. § 29-1207. (Filing 9-12 at CM/ECF pages 50-56.) The trial court overruled this motion to dismiss. (Id. at 57.)

### The Trial

A bench trial began on May 14, 2003. On the day of trial and before the trial started, the judge explained that he had reviewed the DCS protocol, but would not know whether it was relevant or exculpatory until the trial evidence was in. He stated that after the trial evidence was in, he would "compare the evidence with the regulations [the DCS protocol] and then, if it appears there is something exculpatory about it, it will be turned over to [Martin]. If it does not, it will remain under seal." (Filing 9-12 at CM/ECF page 16:3-6.) Martin stated at trial that at the time of the pretrial conference "I forgot to bring that up to the Court, about Melvin Rouf being a witness that there are institutional surveillance tapes." (Filing 9-12 at CM/ECF 17:8-10.) Martin stated that he needed Rouf "to show the Court cause that the institutional surveillance tapes do exist and that we do need this for me to pre[s]ent a defense . . . ." (Filing 9-12 at CM/ECF 18:2-5.)

The state called two witnesses, Officers Strasburg and Rumery.  Strasburg testified that on June 7, 2001, he was an officer at the Nebraska State Penitentiary, and was in Martin's secure hospital room helping officers Rumery and LeDuc feed Martin.  (Filing 9-12 at CM/ECF page 19, 21-22.)  On that day, there were no surveillance cameras in the hospital building and no one "had a hand-held or portable camera with them to record."  (Id. at 22:12-13.)  Strasburg stated that Martin struck him with his closed hand on the left cheek.  (Id. at 23:11-17.)  When asked if he suffered any injury, Strasburg said "my cheek hurt and it swelled up a little bit and turned red, [and] . . . the pain lasted . . . two to three days."  (Id. at 23:19-22.)  Strasburg also testified that an officer injured by an inmate had discretion whether to seek medical treatment, and that he did not seek medical treatment.  (Id. at 23:23-24:6.)  Finally, Strasburg testified that there was a "policy of documenting the incident after one occurs when a staff member is assaulted" which required a "use of force package [to be] filled out and reports written," and that he documented the incident on an incident report.  (Id. at 24:7-14.)

Martin asked only one question of Strasburg on cross-examination: "are you a soliciter of prostitution?"  (Id. at 25:4-5.)  The court sustained an objection to the question over Martin's assertion that Strasburg "showed a personal relation with a cousin of mine," indicating that Strasburg's credibility was in question.  (Id. at 25:7-19.)

Officer Rumery was the state's second witness.  His testimony corroborated Strasburg's.  He, LeDuc and Strasburg were in Martin's hospital room to feed Martin.  (Id. at 28.)  In the area where Martin was then housed and fed, there were no surveillance cameras and no one had a hand-held camera.  (Id. at 29.)  Rumery saw Martin strike Strasburg on the left side of his face with a closed hand.  (Id. at 30-31.)  When asked if he was "aware of any policy or procedure where you have to document an incident after a staff member is assaulted by an inmate," Rumery testified that "I know I wrote a report that day."  (Id. at 31:3-6.)  Martin had no questions on cross

examination, but stated that he had an "objection to their testimony," as "[h]e ain't got no proof that I hit him . . . ." (Id. at 32:13-14.)

Martin called Officer LeDuc as a witness. LeDuc stated that Martin was in hospital room two, and that when he opened the door to that room to feed Martin, he was with Officers Rumery and Strasburg. As soon as LeDuc opened the door, Martin got up off his bed and confronted LeDuc. Martin put his finger on LeDuc's chest, LeDuc gave a directive for Martin to move back, and when Martin did not comply LeDuc began pushing Martin backwards with the palms of his hands. (Id. at 35.) Martin was "belligerent" and "combative." (Id. at 56.) LeDuc stated that he "didn't see any swings" by Martin to the other officers, as LeDuc was focusing on Martin's mid-section. (Id.) Martin asked LeDuc whether Martin would have had to hit LeDuc to be able to hit either Strasburg or Rumery, as those officers were behind LeDuc. LeDuc replied that although the other two officers were behind him when he entered the room, they were beside him once they entered the room. (Id. at 37.) On cross-examination, when LeDuc was asked "[c]ould it have been that he [Martin] swung his arm and you just didn't see it," LeDuc replied "[i]t's possible." (Id. at 39:2-4.) As soon as the three officers left Martin's room, Strasburg told LeDuc that "Martin hit me." (Id. at 40:14.) Based on that statement, LeDuc wrote a report indicating that Martin hit Strasburg in the face. LeDuc confirmed that there were no video cameras in Martin's hospital room, no surveillance cameras anywhere in the hospital unit, and no cameras present during the incident. (Id. at 41.)

Following LeDuc's testimony, Martin stated that he needed "a witness, Melvin Rupp[5] to show that there's institutional surveillance tapes . . . ." (Id. at 43:5-6.) The trial judge asked if Rupp had been subpoenaed, and Martin stated that he had filed

---

[5]The trial transcript spells the name of this individual as both "Rupp" and "Rouf." I use both spellings, depending on the portion of the transcript I quote or summarize.

several subpoenas in February, but hadn't "been allowed any." (Id. at 43:11.)[6] When asked for its position with regard to calling additional witnesses, counsel for the state indicated that as the matter had been set for trial, Martin was obligated to get his witnesses to court. The state's counsel doubted whether any praecipes for subpoenas had been filed, and asserted that in light of the testimony of Officers Strasburg, Rumery, and LeDuc, as well as the affidavit from deputy warden Predmore, stating that there were no video tapes of the incident, it would be futile to continue the trial, as Rupp would merely confirm that there were no video tapes. (Id. at 43-44.) Martin argued that he had filed a motion in February for Rupp and a prison nurse to be brought to the trial to testify. (Id. at 44-45.)

The trial judge did not then rule on whether trial would be continued to permit Martin to get Rupp to appear as a witness. He adjourned the trial until June 9, 2003 so that he could review the sealed DCS protocol to determine whether that protocol constituted exculpatory evidence that should be provided to Martin. (Id. at 47.)

When trial resumed on June 9, 2003, the trial judge "judicially note[d] at this time that we have sealed the material [the DCS protocol] and it is to remain sealed and confidential." (Id. at 49:14-15.) Martin made and argued a motion to dismiss. (Id. at 50-55.) His motion to dismiss was denied. (Id. at 57.) Martin made a motion for the trial judge's recusal, for reasons given in a profanity-laced diatribe. (Id. at 57-61.) The motion for recusal was denied. (Id. at 61.) The trial judge found that the evidence showed beyond a reasonable doubt that Martin was guilty of third degree assault on an officer. (Id. at 62.)

---

[6]The transcript of the February hearing at which Martin requested additional witnesses does not indicate that Martin filed praecipes for subpoenas.

### *The Direct Appeal*

Martin was sentenced on the assault conviction on December 19, 2003. (Filing 9-2 at CM/ECF page 8.) He filed a notice of appeal on January 5, 2004. (Filing 9-2 at CM/ECF pages 9-10.) Martin filed a brief supporting his direct appeal in January, 2004. (Filing 9-2 at CM/ECF page 11, continuing through filing 9-3 at CM/ECF page 32.) The state moved for summary affirmance pursuant to Rule 7B(2) of the Rules of Practice and Procedure in the Nebraska Supreme Court and Court of Appeals, and submitted a brief in support of the motion, on April 14, 2004. (Filing 9-3 at CM/ECF page 14.) Rule 7B(2) provides for motions for summary affirmance "on the ground that the questions presented for review are so unsubstantial as not to require argument" and requires that the motion "document the claimed lack of substance of the questions presented by citations to the dispositive portions of the record and to the controlling statutory and case law."[7]

The Nebraska Court of Appeals sustained the state's motion for summary affirmance and affirmed the judgment on June 10, 2004. The order simply provided: "Motion of appellee for summary affirmance sustained; judgment affirmed. See Rule 7B(2)." (Filing 9-3 at CM/ECF page 24.)

Martin filed a petition for further review by the Nebraska Supreme Court on June 15, 2004. (Filing 9-3 at CM/ECF page 25.) The Nebraska Supreme Court summarily overruled it on September 1, 2004, in an order which simply provided "[p]etition for further review overruled." (Filing 9-3 at CM/ECF page 33.)

---

[7]By contrast, Rule 7B(1) provides for motions for summary dismissal "for lack of jurisdiction."

### *The Habeas Claims*

Martin's habeas petition and other submissions to this court contain varied descriptions of the claims he asserts. In my previous order denying summary judgment, I found that Martin raises these claims:

**Claim 1.**  Abuse of judicial discretion, by untenable decision not in conjunction with laws:

    a.    The trial judge refused to dismiss the case after 14 months of pretrial delay, thereby denying the petitioner his right to a speedy trial;

    b.    The trial judge refused to allow the petitioner to present a defense, argue his theory of the defense, call witnesses or question state witnesses;

    c.    The trial judge refused to require or allow disclosure of evidence favorable to the defense, i.e., tapes of the incident and the protocol of the Department of Correctional Services ("DCS") applicable to alleged assaults by inmates; and

    d.    The trial judge refused to dismiss the charge notwithstanding the testimony of state witness, John LeDuc, who testified that the petitioner never assaulted, or attempted to assault, him or anyone else.

**Claim 2.**  <u>Brady</u> violations: Denial of surveillance tapes and DCS protocol; disregard of LeDuc testimony.

**Claim 3.**  Due Process violations:

    a.    The trial judge denied the petitioner a free transcript, even though the petitioner was proceeding as a pauper, so that the petitioner could adequately appeal;

    b.    The trial judge denied the petitioner closing arguments or an opportunity to present a defense, question state

witnesses, call defense witnesses, or argue his theory of the defense; and

c.     The trial judge forced the petitioner to wear chains during the trial.

**Claim 4.** Equal Protection violations: Denial of a speedy trial; warrantless arrest without probable cause; conviction in the absence of any physical evidence of assault; denial of due process because of the petitioner's race.

(Filing 16 at 1-2.) Though there have been minor variations in Martin's description of his claims since then, the gravamen of Martin's petition is as described above.

## II.  ANALYSIS

### General Principles

Before addressing the specifics, it is helpful to set out the general legal principles that govern this case. In "bullet point" fashion, those principles are set forth below.

\*     As for the standard of review, when a state court has adjudicated a habeas petitioner's claim on the merits, there is a very limited and extremely deferential standard of review both as to the facts and the law. See 28 U.S.C. § 2254(d). Sometimes, however, it will be difficult to determine what the state courts did and therefore difficult to determine what standard of review is appropriate. See, e.g., Pfau v. Ault, 409 F.3d 933, 939 (8th Cir. 2005). In those circumstances, a court may choose "to avoid entanglement" with state procedural questions, and apply a de novo standard of review. Id. That is particularly so where a "claim is doomed to failure whether we apply a de novo standard or follow AEDPA's mandate." Id.

\*      With regard to the deference owed to factual findings of a state court's decision on the merits, a federal court is bound by those findings unless the state court made a "decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  Additionally, a federal court must presume that a factual determination made by the state court is correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

\*      With regard to the deference owed to the conclusions of law set forth in a state court's decision on the merits, a federal court may not grant a writ of habeas corpus unless the state court's legal conclusion "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

\*      In general, a habeas petitioner must first present each claim he wishes to litigate in federal court to the state courts. 28 U.S.C. § 2254(b)(1).  See also Anderson v. Harless, 459 U.S. 4, 6, (1982) (A claim is properly presented when the state courts are given a "'fair opportunity' to apply controlling legal principles to the facts bearing upon [the claim].") (quoting Picard v. Connor, 404 U.S. 270, 275, 277-78 (1971)).

\*      If a petitioner fails to "fairly present" his claim to the state courts, and he can no longer present the claim to the state courts because, for example, a state court rule prohibits serial litigation, then the federal court will be precluded from considering the claim *unless* the petitioner can fit himself into one of two exceptions. See, e.g., Winfield v. Roper, 460 F.3d 1026, 1034 (8th Cir. 2006).  That is, the petitioner must demonstrate "cause and prejudice" or a "miscarriage of justice" (like "actual innocence") in order to prosecute a claim when that claim has not been, and cannot be, asserted in the state courts.  Id.

-13-

     *     As for resolution of the merits of a claim in federal court, no evidentiary hearing is necessary as to an issue that may be resolved as a matter of law based either on undisputed facts or on the applicant's version of the facts, taken as true. See, e.g., Johnston v. Luebbers, 288 F.3d 1048, 1059 (8th Cir. 2002) (district court did not abuse its discretion in denying habeas corpus petitioner's request for an evidentiary hearing on claim that his counsel was ineffective where record already contained facts necessary to resolve the claim).

     *     Even when there is a procedural question presented, a court may alternatively reach the merits where the record is adequate to do so. See, e.g., Winfield, 460 F.3d at 1038 (where the record before the court, which included the original transcripts, the record of the state court's evidentiary hearing, the petitioner's habeas petition, and numerous briefs, presented adequate information upon which to base a decision on the merits of the petitioner's ineffective assistance of counsel claim, a court may alternatively consider the merits of the petitioner's claim rather than concentrating only on procedural questions); Barrett v. Acevedo, 169 F.3d 1155, 1162 (8th Cir. 1999) ("Although the procedural bar issue should ordinarily be resolved first, judicial economy sometimes dictates reaching the merits if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated.") (en banc). Indeed, 28 U.S.C. § 2254(b)(2) provides: "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."

### *Standard of Review*

     Before addressing the merits of Martin's claims, I consider the applicable standard of review. The state appellate courts summarily affirmed the conviction in one or two sentence orders. (Filing 9-3 at CM/ECF page 24 (Nebraska Court of Appeals) & CM/ECF page 33 (Nebraska Supreme Court).) The briefs on appeal addressed both federal and state law issues on the merits. (Filings 8, 9-2, 11.) Thus

this case is one of those in which it is difficult to determine whether the state court decisions were on the merits of federal claims.  To avoid entanglement with state procedural questions and because habeas relief must be denied *regardless* of the standard applied, I will conduct a de novo review of Martin's remaining claims.  Pfau, 409 F.3d at 939 n.2.

### *Claim 1(a)*:  *Speedy trial*

Martin argues that "[t]he trial court refused to allow the Defendant the protection of the Neb. Rev. Stat. § 29-1207" by allowing the trial to take place 14 months after the information was filed.  (Filing 27, "Opening Brief" of Martin, at CM/ECF page 10.)  Although I ruled on initial review that the only procedurally defaulted claim was the transcript claim (filing 16), it is now clear that the speedy trial claim is based on state speedy trial provisions and not the Sixth Amendment.  It cannot be considered by this court because it was not fairly presented to the state courts and Martin has failed to show that any exceptions to the rule barring federal habeas consideration of claims not fairly presented to state courts apply in his case.  Martin's pretrial motion to dismiss on state speedy trial grounds was denied on June 9, 2003.  (Filing 9-12 at CM/ECF page 57:9-10.)  Under Nebraska law, denial of a motion to dismiss based on speedy trial grounds is an appealable order, and appellate courts lack jurisdiction unless the denial is appealed within thirty days.  State v. Jacques, 570 N.W.2d 331, 334-36 (Neb. 1997).  Martin did not appeal the denial of his motion within thirty days.  For that reason, the state appellate courts could not consider Martin's state speedy trial claim.

Even if Martin's speedy trial claim is deemed to be based on the Sixth Amendment, it is without merit.  Although the Sixth Amendment guarantees a criminal defendant the right to a speedy trial,

"to trigger a [Sixth Amendment] speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively judicial' delay." Doggett [v. United States], 505 U.S. [647], 651-52 [(1992)]. This generally occurs if the delay is at least one year long. Id. at 652 n.1. If the defendant makes this showing, then the court conducts the speedy trial analysis by weighing four factors: the length of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. Id. at 651-52, [United States v.] Sprouts, 282 F.3d [1037], 1042-43 [(2002)].

United States v. Brown, 325 F.3d 1032, 1034 (8th Cir.), cert. denied, 539 U.S. 953 (2003). Assuming that the fourteen months between the filing of the information and Martin's trial was a presumptively judicial delay, I conclude that the four speedy trial factors (length of delay, reason for delay, defendant's assertion of his right, and prejudice to defendant) clearly weigh in favor of the State. Martin filed seven pretrial motions, and his actions caused the trial judge on his own motion to seek a mental examination to determine Martin's competency. Ruling on the motions and making findings as to Martin's competency consumed over 300 days. Martin would have been tried in less than a year after he was charged absent his many motions and the fact that his actions created the need for a competency hearing. (Filing 9-12 at CM/ECF page 55:25-57:5 (prosecutor's explanation of multiple motions filed by Martin, and the court's motion for mental exam and the time for ruling on those motions, and the time for resolution of those motions, which I adopt).

### Claim 1(b):  The trial judge refused to allow the petitioner to present a defense, argue his theory of the defense, call witnesses or question state witnesses

Martin has a laundry list of claims to the effect that the trial judge prevented him from putting on an effective defense. The record belies these assertions.

Fundamentally, Martin misunderstands the elements of the crime for which he was convicted. Martin was charged with third degree assault on an officer in violation of Neb. Rev. Stat. Ann. § 28-931. (Filing 37-2 at CM/ECF page 1 (information).) That crime is statutorily defined as follows:

> A person commits the offense of assault on an officer in the third degree if he or she *intentionally*, knowingly, or recklessly causes *bodily injury* to a peace officer, a probation officer, or an employee of the Department of Correctional Services while such officer or employee is engaged in the performance of his or her official duties.

Neb. Rev. Stat. Ann. § 28-931(1) (emphasis added) (LexisNexis 2003).[8]

Throughout trial, direct appeal, and this habeas proceeding, Martin has consistently asserted that he could not have violated section 28-931 because Officer Strasburg did not require medical attention. Martin misunderstands the statute. An assault need not culminate in "visible markings" such as bruises or visible injuries to constitute a violation of section 28-931. State v. Green, 483 N.W.2d 748, 750 (Neb. 1992). "Bodily injury" is inferred when a victim is punched in the face. Cf. State v. Waltrip, 484 N.W. 2d 831, 832-33 (Neb. 1992) (affirming conviction of third degree assault under Neb. Rev. Stat. Ann. § 28-310 when defendant intentionally punched victim in face, even though victim testified that he felt no pain, as "bodily injury" is inferred from a punch in the face).[9] Accordingly, an assault results in "bodily injury"

---

[8]I cite the current compilation of Nebraska statutes, which contain §§ 28-931 and 28-310 (noted in the next paragraph) as in effect at the time of the assault.

[9]Section 28-310 defines the crime of third degree assault of any person as "[i]ntentionally, knowingly, or recklessly caus[ing] bodily injury to another person . . . ." Other than the fact that section 28-931 criminalizes only assaults on peace officers, and section 28-310 criminalizes assaults on any victim, sections 28-931 and 28-310 are identical. Statutes pertaining to the same subject matter should be similarly construed. See, e.g., State v. Hamik, 635 N.W.2d 123, 130-31 (Neb. 2001).

when a victim is struck on the face, whether or not the victim requires medical attention.

On February 13, 2003, Martin argued a pretrial motion "to add witnesses". (Filing 9-11 at CM/ECF pages 61-63.) When asked by the trial judge what witnesses he wanted to add to the list, Martin did not respond to the question. (Filing 9-11 at CM/ECF 62:11-18.) The prosecutor indicated he had no objection to Martin calling *any* witnesses, so long as they were relevant to the charge for which Martin was being tried. (Filing 9-11 at CM/ECF pages 62-63.) The hearing was concluded without a ruling on Martin's motion to add witnesses.

At trial, Martin was allowed to cross examine the two witnesses for the state. He asked only one question of Officer Strasburg and no questions of Officer Rumery. Martin was allowed to call Officer LeDuc, who was present in court as a potential prosecution witness, as his own witness. When the trial judge inquired whether Martin had any additional witnesses, Martin responded that he needed two witnesses: Melvin Rupp, to show that there were prison surveillance tapes of the incident and Donna Kennedy, a nurse in the prison hospital. (Filing 9-12 at CM/ECF page 43:5-13.) Inquiry by the trial judge indicated that neither witness had been subpoenaed and neither was present in court. (Id.) The trial judge adjourned the trial at that point, for three weeks, to review the DCS protocol for a determination whether it was exculpatory material that should be provided to Martin. (Filing 9-12 at CM/ECF pages 47:7-48:10.) When the trial was reconvened on June 9, 2003, Martin made no showing that he had sought subpoenas for Rupp or Kennedy. Martin had ample time to obtain subpoenas during the three weeks the trial was adjourned for review of the DCS protocol. It was not constitutional error for the trial judge to refuse to again continue the trial to enable Martin to subpoena these two witnesses. As three witnesses and an affidavit from a deputy prison warden had already stated there were no surveillance tapes, there is no reason to believe Rupp or Kennedy would have testified to the contrary in the absence of a showing by Martin of their likely

-18-

testimony.  Furthermore, a defendant does not have an absolute right to present evidence and must comply with established rules of evidence and procedure.  See Taylor v. Illinois, 484 U.S. 400, 410-12 (1988) (Compulsory Process Clause of Sixth Amendment did not bar preclusion of testimony of defense witness as sanction for violating discovery rule).  Martin did not follow the necessary procedure for calling Rupp or Kennedy as witnesses.

### Claim 1(c): The trial judge refused to require or allow disclosure of evidence favorable to the defense, i.e., tapes of the incident and the protocol of DCS applicable to alleged assaults by inmates

Martin does not believe the uncontroverted evidence in the record that no video tapes exist.  As I earlier noted, the three trial witnesses testified that there are no video tapes of this incident and that no camera was present in the prison hospital at the time of the assault and a deputy prison warden submitted a pretrial affidavit to this effect.  The prosecutor represented to the judge in a pretrial hearing that there were no video tapes of the incident, that he understood that if such video tapes existed he was required to disclose them to the defendant, and that if any video tapes were discovered he would disclose them to Martin.  (Filing 9-11 at CM/ECF pages 22, 24-25.)  The trial judge committed no constitutional error in refusing to require disclosure of non-existent evidence.

The trial judge reviewed the DCS protocol and found that it was not exculpatory.  To the extent that the deferential standard of review applies to this finding, there is no reason to overturn the trial judge's determination regarding the nature of the DCS protocol.  To the extent that de novo review is applicable, I have independently reviewed the DCS protocol, and I also find that the DCS protocol is not exculpatory under Brady and its progeny.

### Claim 1(d): The trial judge refused to dismiss the charge notwithstanding the testimony of state witness John LeDuc,

-19-

*who testified that the prisoner never assaulted,*
*or attempted to assault, him or anyone else*

Martin asserts that if LeDuc's testimony is properly considered, there is insufficient evidence to support his conviction.  He is wrong.

The applicable standard of review on a claim of insufficient evidence to support a conviction is this:

> Within the context of § 2254, we consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979) ("[U]nder 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.") (citation omitted).  We presume the findings of fact made by the [state] courts are correct unless [petitioner] rebuts the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); Hall v. Luebbers, 341 F.3d 706, 712 (8th Cir. 2003).

Liggins v. Burger, 422 F.3d 642, 647 (8th Cir. 2005), cert. denied, 126 S.Ct. 1359 (2006).  Strasburg's testimony alone was enough to convict Martin.  See Loeblein v. Dormire, 229 F.3d 724, 726 (8th Cir. 2000) (victim's testimony is, by itself, normally sufficient to sustain a conviction), cert. denied, 532 U.S. 982 (2001).  Furthermore, Strasburg's testimony does not stand alone but is corroborated by the testimony of the two other trial witnesses.

Martin mischaracterizes LeDuc's testimony.  As it is central to Martin's habeas claims, I summarize it again here.  LeDuc testified that when he entered Martin's hospital room, Officers Strasburg and Rumery were behind him.  Martin was belligerent and combative and placed his finger on LeDuc's chest.  LeDuc pushed Martin back into the room with the palms of his hands.  LeDuc did not see Martin

-20-

swing at Strasburg, because he was concentrating on Martin's midsection, but said it was possible that Martin did strike Strasburg and LeDuc just didn't see it. Martin asked LeDuc whether Martin would have had to hit LeDuc to be able to hit either Strasburg or Rumery, as those officers were behind LeDuc. LeDuc replied that although the other two officers were behind him when he entered the room, they were beside him once they entered the room. LeDuc confirmed that there were no video cameras in Martin's hospital room, no surveillance cameras anywhere in the hospital unit, and no cameras present during the incident. (Filing 9-12 at CM/ECF page 41.)

LeDuc's testimony does *not* create reasonable doubt as to whether Martin struck Strasburg in the face. It supports the testimony of Strasburg and Rumery. I reject the claim that the evidence was insufficient to support the verdict.

### Claim 2:  Brady violations:  Denial of surveillance tapes and DCS protocol, disregard of LeDuc testimony

This claim repeats claims 1(c) and 1(d), which I have already explained are without merit.

### Claim 3: The due process claims

Martin asserts that he was denied due process in three particular respects. Before addressing the specific claims, I note the standard for establishing a due process claim in a habeas petition:

> To determine whether a due process violation has occurred, a court must examine the totality of the circumstances and determine whether "the error was so gross, conspicuously prejudicial, or otherwise of such magnitude that it fatally infected the trial and failed to afford petitioner the fundamental fairness which is the essence of due process." Mercer v. Armontrout, 844 F.2d 582, 587 (8th Cir. 1988) (citations omitted).

-21-

<u>Amrine v. Bowersox</u>, 238 F.3d 1023, 1032-33 (8th Cir.) (denying habeas petitioner's due process claim), <u>cert.</u> <u>denied</u>, 534 U.S. 963 (2001).  As I explain, Martin has failed to establish that any of the alleged irregularities fatally infected his trial in a manner denying due process.  I now turn to the particulars of Martin's due process claims.

### *Claim 3(a).  The trial judge denied the petitioner a free transcript*

I have previously held that this claim was procedurally defaulted and could not be pursued in this action unless Martin demonstrated cause and prejudice to excuse the procedural default.  (Filing 16.)  Martin has failed to make the necessary showing and I do not consider this claim.

### *Claim 3(b): The trial judge denied the petitioner closing arguments or an opportunity to present a defense, question state witnesses, call defense witnesses, or argue his theory of the defense*

At the close of trial, Martin argued a motion to dismiss, making arguments he has continually reasserted since that time:  (1) the indictment was improper because there was no probable cause to believe he had committed the offense and so no probably cause to support a warrantless arrest; (2) state speedy trial provisions were violated; (3) his prosecution was prompted by racial discrimination, as there was insufficient evidence that he had committed the offense; (4) a syllogism belied by the facts:  LeDuc was standing between Martin and Strasburg, Martin could not have hit Strasburg in the face without hitting LeDuc, and Martin did not hit LeDuc–so Martin could not have hit Strasburg; (5) there was no "assault" because there were no injuries requiring medical attention, and (6) there must have been video tapes of the incident, and they would prove his innocence.  (Filing 9-12 at CM/ECF pages 50-55.)

Martin's  argument for dismissing the case clearly explained his theory of the defense.  It made all the arguments that would have been made in a closing argument.

I have already explained that Martin was allowed to question the prosecution's witnesses and to call a witness present in court as a potential prosecution witness on his behalf. I have also explained that Martin was unable to call two witnesses because he failed to obtain subpoenas although he had ample opportunity to do so. Requiring Martin to comply with procedural rules to call witnesses, after notice and opportunity to do so, does not deny "fundamental fairness" to Martin.

### Claim 3(c): Forcing the petitioner to wear chains during the trial

"The two main constitutional concerns about the use of shackles during a trial are that they could impede a defendant's ability to participate and could suggest that the defendant is guilty." Hall v. Luebbers, 296 F.3d 685, 698 (8th Cir. 2002), cert. denied, 538 U.S. 951 (2003). These concerns disappear when the trial is to a judge rather than to a jury. As Martin waived his right to a jury trial and was tried in a bench trial, his argument that requiring him to appear in chains violates due process is without merit.

### Claim 4:  Equal Protection violations:
### denial of a speedy trial;
### warrantless arrest without probable cause;
### conviction in the absence of any physical evidence of assault;
### denial of due process because of the petitioner's race

Proof of racially discriminatory intent or purpose is required to establish a violation of the Equal Protection Clause. See, e.g., Britton v. Rogers, 631 F.2d 572, 577 (1980) (denying habeas petitioner's claim of equal protection violation for failure to supply factual predicate for the claim), cert. denied, 451 U.S. 939 (1981). Martin has done no more than list trial court rulings with which he disagrees. He has not proffered any evidence of racially discriminatory intent or purpose, and for that reason his equal protection claim fails.

I have already explained that Martin's speedy trial claim is not based on violation of federal law and that there was sufficient evidence to support his conviction for assault and do not address those claims again.  I turn now to his remaining argument: that he was arrested without a warrant or probable cause in violation of Neb. Rev. Stat. § 29-404.03.  This last claim is without merit.

Martin's petition recites that he was "denied . . . protection of Neb. Rev. Stat. 29-404.03.  Arrest without warrant, probable cause, pertaining to information gathered by Nebraska State Patrol, and submitted to County Attorney."  (Filing 1 at 7-8.)  From this, I conclude that Martin is asserting that he was arrested for assaulting Officer Strasburg without a warrant and without probable cause because investigation by the Nebraska State Patrol produced evidence which indicates there was no probable cause to believe Martin assaulted Officer Strasburg.  Martin attached to his brief unauthenticated photocopies of documents purporting to be notes of a Nebraska State Patrol investigator's interview with Officer Strasburg and a prison officer's report of the incident to his superior officer (neither of the officers were witnesses at Martin's trial).  (Filing 27 at CM/ECF pages 32-34.)  Both documents indicated that no "injuries" were reported.  I interpret these reports to mean that Strasburg had no injuries requiring medical attention.

First, at the time of the assault, Martin was in custody at the Nebraska State Prison where he was serving a sentence for another crime.  There was no need for reasonable cause to arrest him, as he was already in custody.

Second, even if I consider the material Martin attached to his brief, that evidence does not establish either that there was no probable cause to believe Martin had assaulted Officer Strasburg or that there was insufficient evidence to convict him.  As I have explained, the crime of third degree assault of an officer requires only that the actor intentionally inflicted bodily injury on an officer, and bodily injury is inferred when a victim is punched in the face, even when the victim feels no pain.

-24-

The fact that Officer Strasburg did not require medical attention for the blow to his face, which was recorded as no "injury" does not negate the elements of the crime of third degree assault of an officer under Neb. Rev. Stat. § 28-931.  As I have previously explained, the testimony of Officers Strasburg, Rumery, and LeDuc was sufficient to convict Martin, as a reasonable person could conclude beyond a reasonable doubt from their testimony that Martin struck intentionally Strasburg in the face.

IT IS ORDERED:

1. The motion in filing 50-1 is granted, and the brief submitted as filing 50-2 is deemed properly filed and has been considered by this court;

2. Martin's objection (filing 51) to the court's January 1, 2007 order directing that the DCS protocol be filed under seal and not disclosed to Martin (filing 49), construed as a motion to reconsider that order, is denied;

3. Martin's "Motion to Compel Answer" (filing 54) is granted to the extent that the court has ruled on his habeas petition and otherwise denied;

4. Martin's petition for a writ of habeas corpus submitted pursuant to 28 U.S.C. § 2254 (filing 1) is denied; and

5. Judgment dismissing the petition with prejudice and denying the petition will be entered by separate document.

March 14, 2007                                    BY THE COURT:

                                                 *s/ Richard G. Kopf*
                                                 United States District Judge

-25-